# EXHIBIT 1



# INDEPENDENT CONTRACTOR SERVICE AGREEMENT

This Independent Contractor Service Agreement ("Agreement") is entered into as of November 25, 2025 ("Effective Date"), by and between:

**ALETYX INC.**, a Delaware corporation with its principal place of business at 2500 Regency Parkway, Cary, NC 27518, United States of America ("Company" or "Client")

and

**VICTOR MARTINS BICUDO LTDA**, a Brazilian limited liability company, with its registered address at Rua da Proclamação, 223, Diadema – SP, 09990–620, Brazil, CNPJ: 62.505.377/0001–50 ("Contractor" or "Service Provider")

(each individually a "Party" and collectively the "Parties")

## RECITALS

WHEREAS, Company desires to engage Contractor to provide specialized software engineering services on an independent contractor basis;

WHEREAS, Contractor represents that it possesses the requisite expertise, resources, and legal capacity to provide such services through its duly authorized representative;

WHEREAS, the Parties intend to establish an independent contractor relationship and explicitly disclaim any intention to create an employment relationship under the laws of any jurisdiction;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1: ENGAGEMENT AND SCOPE OF SERVICES

### 1.1 Engagement

Company hereby engages Contractor, and Contractor hereby accepts engagement, to provide software engineering services as an independent contractor pursuant to the terms and conditions set forth in this Agreement and any applicable Statement of Work ("SOW").

### 1.2 Services

Contractor shall provide the following services ("Services"):

- Frontend engineering and development services
- Software architecture design and implementation
- Code review and technical consultation
- Integration with business process automation systems
- Decision automation platform development
- Other technical services as mutually agreed in writing



## 1.3 Statement of Work

The specific deliverables, milestones, and technical requirements shall be detailed in one or more SOWs, which shall be incorporated herein by reference. The initial SOW is attached hereto as Exhibit A.

## 1.4 Performance Standards

Contractor shall perform the Services in a professional and workmanlike manner consistent with industry standards for senior–level software engineering professionals. Contractor shall dedicate sufficient time and resources to meet agreed deliverables while maintaining complete autonomy over work methods and scheduling.

# ARTICLE 2: INDEPENDENT CONTRACTOR RELATIONSHIP

## 2.1 Independent Contractor Status

The Parties expressly acknowledge and agree that:

(a) Contractor is engaged as an independent contractor and not as an employee, agent, partner, or joint venturer of Company;

(b) This Agreement does not create an employment relationship under U.S. federal or state law, Brazilian labor law (Consolidação das Leis do Trabalho), or the laws of any other jurisdiction;

(c) Contractor shall have exclusive control over the manner and means of performing the Services, subject only to the general specifications set forth in applicable SOWs;

(d) Contractor retains the right to provide services to other clients during the term of this Agreement, provided such services do not conflict with Contractor's obligations hereunder.

## 2.2 Contractor Representations

Contractor represents and warrants that:

(a) It maintains a legitimate business enterprise organized under Brazilian law;

(b) It possesses all necessary licenses, permits, and registrations required to operate its business and perform the Services;

(c) It maintains appropriate business insurance, including professional liability coverage;

(d) It shall be solely responsible for all taxes, social contributions, and other obligations under Brazilian law arising from its business operations;

(e) Victor Bicudo is duly authorized to perform Services on behalf of the Contractor entity.

## 2.3 No Employment Benefits

Contractor acknowledges and agrees that neither Contractor nor its representatives shall be entitled to any employment benefits provided by Company to its employees, including but not limited to health insurance, retirement benefits, paid time off, or any other employee benefits.



## 2.4 Equipment and Resources

(a) **General Equipment Provision**: Contractor shall provide, at its sole expense, workspace, internet connectivity, and general business resources necessary to perform the Services.

(b) **Security–Controlled Equipment**: Notwithstanding subsection (a), Company may, in its sole discretion, provide Contractor with a secured laptop or workstation ("Company Equipment") solely to protect proprietary source code, trade secrets, and confidential information. Such provision is exclusively for information security purposes and shall not be construed as establishing an employment relationship. Contractor acknowledges and agrees that:

(i) Company Equipment remains Company's property and must be returned immediately upon request or termination;

(ii) Use of Company Equipment is optional; Contractor may utilize its own equipment subject to Company's security protocols and monitoring software installation;

(iii) Company Equipment may be monitored, audited, and remotely managed for security compliance;

(iv) Contractor shall execute a separate Equipment Security Agreement governing Company Equipment use;

(v) Contractor remains responsible for all other equipment, software licenses, and resources not explicitly provided by Company;

(vi) Provision of Company Equipment does not alter Contractor's independent status, create any expectation of continued engagement, or imply Company control over work methods or schedule.

(c) **Classification Safe Harbor**: The Parties acknowledge that Company's provision of secured equipment for data protection purposes is consistent with independent contractor relationships in the technology sector, particularly where contractors access proprietary codebases, and does not itself establish employment status under applicable law.

# ARTICLE 3: COMPENSATION AND PAYMENT TERMS

## 3.1 Compensation

Company shall pay Contractor total annual compensation of USD $40,800.00 (FORTY THOUSAND EIGHT HUNDRED U.S. Dollars), payable in monthly installments of USD $3,400.00 subject to receipt of proper invoices as set forth herein.

## 3.2 Invoicing Requirements

Contractor shall submit monthly invoices (Nota Fiscal de Serviços) by the 5th day of each month for services rendered in the preceding month. Each invoice shall include:

(a) Detailed description of Services performed; (b) Applicable SOW reference; (c) Brazilian tax invoice (Nota Fiscal) number; (d) Banking information for wire transfer; (e) Such other information as Company may reasonably require for its records.



## 3.3 Payment Terms

Company shall pay properly submitted invoices within thirty (30) days of receipt via international wire transfer to Contractor's designated bank account. Contractor shall bear all receiving bank fees and foreign exchange costs.

## 3.4 Taxes

Contractor shall be solely responsible for payment of all taxes, duties, contributions, and assessments arising from payments under this Agreement, including but not limited to:

(a) Brazilian federal, state, and municipal taxes; (b) Social contributions (INSS, PIS, COFINS, CSLL); (c) Any withholding obligations under Brazilian law.

Company shall have the right to withhold from payments any taxes required by applicable U.S. law. Contractor shall provide Company with a properly completed IRS Form W–8BEN–E prior to the first payment hereunder.

## 3.5 Currency and Exchange Rate

All payments shall be made in U.S. Dollars. Contractor assumes all risk of currency fluctuation.

# ARTICLE 4: TERM AND TERMINATION

## 4.1 Term

This Agreement shall commence on the Effective Date and continue for a period of one (1) year, unless earlier terminated in accordance with this Article 4.

## 4.2 Termination for Convenience

Either Party may terminate this Agreement for any reason or no reason upon thirty (30) calendar days' prior written notice to the other Party. In the event of such termination, Company shall pay Contractor for all Services satisfactorily performed through the effective date of termination.

## 4.3 Termination for Cause

Either Party may terminate this Agreement immediately upon written notice if:

(a) The other Party materially breaches this Agreement and fails to cure such breach within ten (10) business days after written notice thereof;

(b) The other Party becomes insolvent, makes an assignment for the benefit of creditors, or files or has filed against it a petition in bankruptcy;

(c) The other Party engages in illegal conduct or gross negligence in connection with this Agreement.

## 4.4 Termination by Company for Specific Causes

Company may terminate this Agreement immediately upon written notice if:

(a) Contractor fails to maintain its independent contractor status or triggers employment classification risks;



(b) Contractor breaches confidentiality or intellectual property provisions;

(c) Contractor's performance falls materially below professional standards after notice and opportunity to cure;

(d) Contractor engages in conduct that could harm Company's reputation or business interests.

## 4.5 Effect of Termination

Upon termination:

(a) Contractor shall immediately cease performing Services;

(b) Each Party shall return all property and Confidential Information of the other Party;

(c) Company shall pay for Services satisfactorily performed through termination date;

(d) Provisions that by their nature should survive termination shall remain in effect, including confidentiality, intellectual property, indemnification, and governing law provisions.

## 4.6 Transition Assistance

Upon Company's request, Contractor shall provide reasonable transition assistance for up to thirty (30) days following termination at the same compensation rate, to ensure orderly transfer of work in progress.

# ARTICLE 5: INTELLECTUAL PROPERTY RIGHTS

## 5.1 Work Product Ownership

All work product, deliverables, inventions, discoveries, developments, concepts, ideas, improvements, trade secrets, proprietary information, software code, documentation, and other materials conceived, developed, or created by Contractor in connection with the Services (collectively, "Work Product") shall be considered "work made for hire" under U.S. copyright law to the maximum extent permitted by law.

## 5.2 Assignment of Rights

To the extent any Work Product is not deemed "work made for hire," Contractor hereby irrevocably assigns, transfers, and conveys to Company all right, title, and interest worldwide in and to such Work Product, including all intellectual property rights therein. This assignment includes, without limitation:

(a) All copyrights and applications and registrations therefor; (b) All patent rights and applications therefor; (c) All trade secret rights; (d) All moral rights and droits d'auteur; (e) All rights of attribution and integrity; (f) All other proprietary rights, whether now known or hereafter devised.

## 5.3 Brazilian Law Compliance

Contractor acknowledges that under Brazilian Law No. 9.609/98 (Software Law) and Law No. 9.610/98 (Copyright Law), explicit written assignment of intellectual property rights is required. This Agreement constitutes such explicit written assignment. Contractor waives any moral rights (direitos morais) to the extent permitted under Brazilian law.



## 5.4 Pre-Existing IP

Contractor shall retain ownership of any proprietary methodologies, tools, or materials developed prior to or independent of this Agreement ("Pre-Existing IP"). Contractor grants Company a perpetual, irrevocable, worldwide, royalty-free license to use any Pre-Existing IP incorporated into Work Product.

## 5.5 Further Assurances

Contractor agrees to execute any additional documents and take any further actions reasonably requested by Company to perfect, evidence, or enforce Company's ownership of Work Product.

## 5.6 No Open Source Incorporation

Contractor shall not incorporate any open-source software into Work Product without Company's prior written consent. If approved, Contractor shall provide complete attribution and license compliance documentation.

# ARTICLE 6: CONFIDENTIALITY

## 6.1 Confidential Information

"Confidential Information" means all non-public, proprietary information disclosed by Company to Contractor, including but not limited to:

(a) Software code, algorithms, and technical specifications; (b) Business plans, strategies, and financial information; (c) Customer lists, supplier information, and pricing data; (d) Product roadmaps and development plans; (e) All information marked as confidential or that would reasonably be considered confidential.

## 6.2 Confidentiality Obligations

Contractor shall:

(a) Hold all Confidential Information in strict confidence; (b) Not disclose Confidential Information to any third party without Company's prior written consent; (c) Use Confidential Information solely to perform the Services; (d) Protect Confidential Information with the same degree of care used for its own confidential information, but no less than reasonable care; (e) Limit access to Confidential Information to those representatives with a legitimate need to know.

## 6.3 Exceptions

Confidentiality obligations shall not apply to information that:

(a) Is or becomes publicly available through no breach by Contractor; (b) Is rightfully received from a third party without breach of confidentiality obligations; (c) Is independently developed without use of Confidential Information; (d) Is required to be disclosed by law or court order, provided Contractor provides prompt notice to Company and cooperates in any protective order proceedings.

## 6.4 Return of Information

Upon termination or Company's request, Contractor shall promptly return or destroy all Confidential Information and certify such return or destruction in writing.



## 6.5 Survival

Confidentiality obligations shall survive termination of this Agreement for a period of five (5) years, except for trade secrets, which shall remain confidential indefinitely.

# ARTICLE 7: REPRESENTATIONS AND WARRANTIES

## 7.1 Mutual Representations

Each Party represents and warrants that:

(a) It has full corporate power and authority to enter into this Agreement; (b) This Agreement has been duly authorized and executed; (c) This Agreement constitutes a legal, valid, and binding obligation; (d) Its execution and performance of this Agreement does not conflict with any other agreement or obligation.

## 7.2 Contractor Additional Warranties

Contractor further represents and warrants that:

(a) The Services shall be performed in a professional manner consistent with industry standards; (b) Work Product shall be original and shall not infringe any third-party intellectual property rights; (c) It shall comply with all applicable laws and regulations in performing the Services; (d) It maintains all necessary licenses and permits required for its business operations; (e) It has no obligations or commitments that would prevent or interfere with performance hereunder; (f) It shall not introduce any malicious code, viruses, or harmful components into Company's systems.

## 7.3 Disclaimer

EXCEPT AS EXPRESSLY SET FORTH HEREIN, CONTRACTOR PROVIDES THE SERVICES "AS IS" AND DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

# ARTICLE 8: INDEMNIFICATION

## 8.1 Contractor Indemnification

Contractor shall defend, indemnify, and hold harmless Company and its officers, directors, employees, agents, and affiliates from and against any and all claims, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising from or relating to:

(a) Any breach of this Agreement by Contractor; (b) Any negligent or wrongful act or omission by Contractor in performing the Services; (c) Any claim that Work Product infringes third-party intellectual property rights; (d) Any employment-related claims by Contractor or its representatives; (e) Any failure by Contractor to comply with applicable laws, including tax obligations; (f) Any claim arising from Contractor's breach of confidentiality obligations.

## 8.2 Procedure

The indemnified party shall provide prompt notice of any claim, tender defense and settlement authority to the indemnifying party, and provide reasonable cooperation in the defense. The indemnifying party shall not settle any claim that admits liability or imposes obligations on the indemnified party without prior written consent.



## 8.3 Limitation of Liability

EXCEPT FOR BREACHES OF CONFIDENTIALITY, INTELLECTUAL PROPERTY PROVISIONS, OR INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, REGARDLESS OF THE FORM OF ACTION OR FORESEEABILITY THEREOF.

# ARTICLE 9: RISK ALLOCATION AND INSURANCE

## 9.1 Company Insurance Coverage

Company maintains comprehensive insurance coverage including professional liability, general liability, and cyber liability insurance with carriers licensed in the United States. Company represents that its insurance program contemplates coverage for authorized independent contractors performing services within the scope of their documented engagement, subject to applicable policy terms, conditions, and exclusions.

## 9.2 Contractor Coverage Acknowledgment

Contractor acknowledges and agrees that: (a) Company's insurance program provides primary coverage for claims arising from Services performed within the authorized scope of this Agreement; (b) Such coverage remains subject to Company's policy deductibles, sublimits, and exclusions; (c) Contractor remains personally liable for acts of willful misconduct, gross negligence, or criminal acts exceeding or excluded from policy coverage; (d) Company reserves the right to seek reimbursement for deductibles or uncovered losses resulting from Contractor's failure to meet professional standards or comply with security protocols.

## 9.3 Risk Mitigation Obligations

As consideration for coverage under Company's insurance program, Contractor covenants to: (a) Provide immediate written notice (within 24 hours) of any incidents, breaches, or circumstances that could give rise to a claim; (b) Cooperate fully in any insurance investigation, claim defense, or coverage determination process; (c) Maintain reasonable security practices consistent with industry standards for protection of confidential information; (d) Abstain from any actions or omissions that would void, exclude, or prejudice Company's insurance coverage; (e) Participate in Company's security training and comply with all documented security protocols.

## 9.4 Optional Contractor Insurance

While Company does not require Contractor to maintain independent insurance given the practical constraints of the Brazilian insurance market, if Contractor maintains professional liability or general liability coverage, Contractor shall, to the extent permitted by such policies, name Company as an additional insured and provide certificates of such coverage.

## 9.5 Liability Limitation

Except for (i) willful misconduct, (ii) violations of Article 6 (Confidentiality), (iii) breaches of Article 5 (Intellectual Property Rights), or (iv) criminal acts, Contractor's aggregate liability under this Agreement shall not exceed the total compensation paid to Contractor in the twelve (12) months immediately preceding the event giving rise to liability. This limitation reflects the commercial reality that contractor insurance is not readily available in Brazil at economically feasible rates.



# ARTICLE 10: COMPLIANCE WITH LAWS

## 10.1 Legal Compliance

Each Party shall comply with all applicable laws, regulations, and governmental requirements in performing its obligations hereunder, including but not limited to:

(a) U.S. export control laws and regulations; (b) Brazilian labor, tax, and business regulations; (c) Anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and Brazilian Anti-Corruption Law (Lei Anticorrupção); (d) Data protection and privacy laws.

## 10.2 Anti-Corruption

Contractor represents that it has not and shall not offer, pay, promise, or authorize payment of any money or anything of value to any government official to obtain or retain business or secure any improper advantage.

## 10.3 Export Controls

Contractor acknowledges that software and technical data provided by Company may be subject to U.S. export controls. Contractor shall not export, re-export, or transfer such items except in compliance with applicable laws.

# ARTICLE 11: DISPUTE RESOLUTION

## 11.1 Negotiation

The Parties shall attempt to resolve any dispute through good faith negotiations between senior representatives with authority to settle the dispute.

## 11.2 Arbitration

Any dispute not resolved through negotiation within thirty (30) days shall be submitted to binding arbitration under the International Chamber of Commerce (ICC) Rules of Arbitration. The arbitration shall:

(a) Be conducted by a single arbitrator mutually agreed upon by the Parties; (b) Take place in Miami, Florida, USA; (c) Be conducted in English; (d) Apply Delaware law without regard to conflict of law principles.

## 11.3 Injunctive Relief

Notwithstanding the foregoing, either Party may seek injunctive relief in any court of competent jurisdiction to prevent irreparable harm or preserve the status quo pending arbitration.

## 11.4 Costs

The prevailing Party in any dispute shall be entitled to recover its reasonable attorneys' fees and costs.



# ARTICLE 12: GENERAL PROVISIONS

## 12.1 Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, USA, without regard to its conflict of law principles. The UN Convention on Contracts for the International Sale of Goods shall not apply.

## 12.2 Entire Agreement

This Agreement, including all exhibits and SOWs, constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous agreements, understandings, and communications, whether written or oral, relating to the subject matter hereof.

## 12.3 Amendment

This Agreement may be amended only by a written instrument signed by authorized representatives of both Parties.

## 12.4 Assignment

Contractor may not assign or transfer this Agreement or any rights or obligations hereunder without Company's prior written consent. Company may assign this Agreement to any affiliate or successor in connection with a merger, acquisition, or sale of substantially all assets.

## 12.5 Severability

If any provision of this Agreement is held invalid or unenforceable, the remaining provisions shall continue in full force and effect, and the Parties shall negotiate in good faith to replace the invalid provision with an enforceable provision that achieves the original intent.

## 12.6 Force Majeure

Neither Party shall be liable for delays or failures in performance due to circumstances beyond its reasonable control, including acts of God, natural disasters, war, terrorism, pandemic, government actions, or labor disputes, provided the affected Party promptly notifies the other Party and uses reasonable efforts to mitigate the impact.

## 12.7 Notices

All notices shall be in writing and deemed given when delivered personally, sent by confirmed email, or sent by certified mail, return receipt requested, to:

**If to Company:** Aletyx Inc. 2500 Regency Parkway, Cary, NC 27518, United States of America, Attention: Tim Wuthenow CFO Email: tim@aletyx.ai

**If to Contractor:** VICTOR MARTINS BICUDO LTDA Rua da Proclamação, 223, Diadema – SP, 09990–620, Brazil Attention: Victor Martins Bicudo Email: victor.mbicudo@gmail.com

## 12.8 Waiver

No waiver of any provision shall be effective unless in writing and signed by the Party against whom such waiver is sought to be enforced. No waiver shall constitute a continuing waiver unless expressly stated.



## 12.9 Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument. Electronic signatures shall be deemed valid and binding.

## 12.10 Language

This Agreement is executed in English, which shall be the controlling language for all purposes. Any translation is for convenience only.

## 12.11 Relationship Review

The Parties agree to review the independent contractor relationship quarterly to ensure continued compliance with applicable laws and regulations. Such review shall not create any presumption regarding the nature of the relationship.

## 12.12 Interpretation

This Agreement shall be construed without regard to the Party that drafted it. Section headings are for convenience only and shall not affect interpretation.

# IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**ALETYX INC.**

*Eduardo M Cerqueira*

By:

Eduardo M Cerqueira

Name:

Head of Engineering

Title:

2025-11-18

Date:

**VICTOR MARTINS BICUDO LTDA**

*Victor Martins Bicudo*

By:

Victor Martins Bicudo

Name:



Date: 2025-11-18

# EXHIBIT A: STATEMENT OF WORK #1

**Effective Date:** November 25, 2025 **SOW Term:** 12 months from Effective Date

## 1. SERVICES DESCRIPTION

Contractor shall provide senior backend engineering services focusing on:

### 1.1 Core Development Activities

- Design, develop, and maintain responsive web applications using React and TypeScript
- Create intuitive and accessible user interfaces for enterprise automation tools
- Collaborate with cross-functional teams to deliver high-quality software solutions
- Contribute to system architecture and technical decision-making
- Ensure code quality through testing and best practices
- Development of RESTful APIs and microservices architecture
- Integration with Apache KIE technologies (Drools, Kogito, jBPM)
- Integration with KIE Groups technologies (prior to Apache donation) (Drools, Kogito, jBPM)
- Database design and optimization for decision automation platforms

### 1.2 Technical Leadership Activities

- Code review and technical mentorship
- Architecture design and technical documentation
- Performance optimization and troubleshooting
- Technology evaluation and recommendation
- Participation in technical planning sessions (remote)

### 1.3 Specific Project Focus Areas

- Decision automation platform development
- Business rules engine integration
- Process orchestration implementation
- AI/ML integration with deterministic rules systems
- Cloud deployment and containerization strategies

## 2. DELIVERABLES AND MILESTONES

### 2.1 Ongoing Deliverables (Monthly)

- Minimum of 160 hours of development services per month



- Weekly status reports documenting progress and blockers
- Updated technical documentation for implemented features
- Code submissions via Company's version control system

## 2.2 Quarterly Milestones

**Q1 (Months 1–3):**

- Complete assessment of existing codebase
- Implement initial fronted service architecture
- Deliver first integration with decision automation system

**Q2 (Months 4–6):**

- Deploy production–ready services
- Complete API documentation
- Implement monitoring and observability framework

**Q3 (Months 7–9):**

- Scale frontend services for enterprise deployment
- Implement advanced decision automation features
- Complete performance optimization phase

**Q4 (Months 10–12):**

- Finalize all pending features
- Complete comprehensive documentation
- Knowledge transfer and transition planning

## 3. PERFORMANCE STANDARDS

## 3.1 Quality Metrics

- Code coverage minimum 80% for new features
- All code must pass automated quality checks
- Response time to critical issues within 4 business hours
- Documentation completeness for all public APIs

## 3.2 Availability Requirements

- Available during overlapping business hours (minimum 4 hours daily overlap with US Eastern Time)
- Responsive to communications within one business day
- Participation in weekly team meetings (remote)

## 4. COMPANY RESPONSIBILITIES

Company shall provide:



- Access to necessary development environments and tools
- VPN access for secure system connectivity
- Repository access and development licenses
- Technical specifications and requirements documentation
- Timely feedback on submitted work

# 5. ACCEPTANCE CRITERIA

Work shall be deemed accepted upon:

- Successful completion of defined acceptance tests
- Code review approval by Company's technical team
- Deployment to staging environment without critical issues
- Documentation review and approval

# 6. CHANGE MANAGEMENT

Any changes to this SOW must be documented in writing and signed by both Parties. Changes may impact timeline and compensation, which shall be negotiated in good faith.

# 7. SPECIFIC TERMS

This SOW is governed by and incorporated into the Independent Contractor Service Agreement dated November 25, 2025. In case of conflict, the main Agreement shall control.

**ACKNOWLEDGED AND AGREED:**

**ALETYX INC.**

By: *Eduardo M Cerqueira*

Date: 2025-11-18

**VICTOR MARTINS BICUDO LTDA**

By: *Victor Martins Bicudo*

Date: 2025-11-18

# Audit trail

## Details

| | |
|---|---|
| FILE NAME | Contractor Agreement - Victor Bicudo - 11/17/25, 9:28 PM |
| STATUS | ● Signed |
| STATUS TIMESTAMP | 2025/11/18 14:39:04 UTC |

## Activity

| | | |
|---|---|---|
| **SENT** | eduardo@aletyx.ai **sent** a signature request to:<br>• Eduardo M Cerqueira (eduardo@aletyx.ai)<br>• Victor Martins Bicudo (victormbicudo@gmail.com) | 2025/11/18 02:30:22 UTC |
| **SIGNED** | **Signed** by Victor Martins Bicudo (victormbicudo@gmail.com) | 2025/11/18 14:27:08 UTC |
| **SIGNED** | **Signed** by Eduardo M Cerqueira (eduardo@aletyx.ai) | 2025/11/18 14:39:04 UTC |
| **COMPLETED** | This document has been signed by all signers and is **complete** | 2025/11/18 14:39:04 UTC |

The email address indicated above for each signer may be associated with a Google account, and may either be the primary email address or secondary email address associated with that account.